IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRENDA McGUIRE,                          )
                                         )
                Plaintiff,               )
                                         )       No. 12 C 1413
v.                                       )
                                         )       Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,[1]      )
                                         )
                Defendant.               )

## MEMORANDUM OPINION AND ORDER[2]

Brenda McGuire seeks an order reversing or remanding the decision of the Commissioner

of the Social Security Administration ("Commissioner") denying her applications for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (docs. ## 25, 26:

Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security

("Pl.'s Mem.")). The Commissioner has filed a response, seeking to affirm the denial of benefits

(doc. # 36: Defendant's Memorandum in Support of Motion for Summary Judgment and

Response to Plaintiff's Motion for Summary Judgment ("Def.'s Mem.")). For the reasons set

forth below, we deny Ms. McGuire's motion and affirm the Commissioner's final decision.

## I.

We begin with the procedural history. On May 27, 2008, Ms. McGuire applied for DIB

and SSI, alleging a disability onset date of March 25, 2005 (R. 22, 219, 224, 233, 238-39) (which

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Carolyn W. Colvin as the named
defendant.

[2]On May 1, 2012, by consent of the parties and in accordance with 28 U.S.C. § 636(c) and Local Rule 73.1,
this matter was reassigned to this Court for all further proceedings, including entry of final judgment (docs. ## 12,
16).

was amended to May 23, 2008, her fiftieth birthday) (R. 253). Based on her employment

history, Ms. McGuire's last date of insured status was September 30, 2009 (R. 231). Her claims

were denied initially and upon reconsideration (R. 101-02, 103-04). She requested a hearing

before an Administrative Law Judge ("ALJ"), which was granted and held on July 29, 2010 (R.

34, 126-27). On August 18, 2010, the ALJ issued a written decision finding that Ms. McGuire

was not disabled through the date of the opinion,[3] under sections 216(i), 223(d), and

1614(a)(3)(A) of the Social Security Act ("the Act") (R. 22-28). 42 U.S.C. §§ 416(i), 423(d),

and 1382c(a)(3)(A). The Appeals Council denied review on July 8, 2011 (R. 11-15), making the

ALJ's decision the final decision of the Commissioner. *Pepper v. Colvin*, 712 F.3d 351, 361 (7th

Cir. 2013).

## II.

We next summarize the administrative record. We set forth the general background in

Part A, followed by a summary of the medical record in Part B. Part C reviews the hearing

testimony, and Part D addresses the ALJ's written opinion.

### A.

Brenda McGuire was born on May 23, 1958 (R. 40). She has completed high school and

some undergraduate education (R. 41, 272). Ms. McGuire is widowed and has lived with her

adult daughter since 2003 (R. 40-42). She has worked as a telemetry technician, a bakery

laborer, and an office clerk (R. 289). She asserted that she became unable to work on March 25,

2005, due to her high blood pressure, deep venous thrombosis ("DVT"), high cholesterol, and a

---

[3] To be entitled to Disability Insurance Benefits, a claimant must establish that her disability arose while she was insured for benefits. 42 U.S.C. § 423(a)(1)(A), (c)(1); *Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011). An applicant who cannot establish that she was disabled during the insured period for DIB may still receive Supplemental Security Income benefits if she can establish that she is disabled and has limited means. 42 U.S.C. §§ 1381a, 1382; *Liskowitz v. Astrue*, 559 F.3d 736, 740 n.2 (7th Cir. 2009).

heart problem (R. 265). Ms. McGuire also claimed that side effects from her medications, such as a need to rest and elevate her legs due to pain and swelling, limit her ability to work (R. 53-54, 56-57, 59, 61-62).

Ms. McGuire prepared daily meals for herself and her grandchildren, made her bed, swept, washed dishes, did light laundry, attended church twice a month, sang in the choir, and handled her own finances (R. 279-81). She no longer drove because of dizziness, lightheadedness, and weakness (R. 280, 284).

Ms. McGuire has not engaged in substantial gainful activity since her alleged onset date, however, she reported earnings of $300 per month for babysitting her daughter's two children in their shared residence at the time of her application (R. 256). Ms. McGuire was also paid for babysitting her son's infant daughter in his home (R. 78–79).

**B.**

We continue by reviewing Ms. McGuire's medical record. We will first discuss Ms. McGuire's hospitalizations in 2005 for hypertensive problems and related intracranial hemorrhage, as well as anemia and blood clots, also known as deep vein thromboses ("DVTs"). We then review Ms. McGuire's subsequent outpatient care through 2010, which includes visits to both treating primary care doctors and specialists, as well as evaluations and medical record reviews conducted by consulting disability physicians.

On February 25, 2005, Ms. McGuire went to Loretto Hospital complaining of headache, weakness, vomiting, blurry vision, difficulty breathing, and chest pain (R. 356). That day she was transferred to Advocate Illinois Masonic Medical Center ("Masonic") for management of her hypertension and related intracranial hemorrhage (R. 357-58, 362, 383).

At Masonic, Ms. McGuire had two blood transfusions for anemia (R. 430). She was taking hydrochlorothiazide for her blood pressure (R. 432). On March 4, 2005, Ms. McGuire complained of left lower leg pain, but did not have a DVT (R. 452–53). On March 8, 2005, doctors placed an inferior vena cava ("IVC") filter[4] after a DVT was found in Ms. McGuire's left leg (R. 430, 454). She was discharged on March 10, 2005 (R. 430).

On March 19, 2005, Ms. McGuire presented to Loyola University Hospital ("Loyola") complaining of headache, blurry vision, dizziness, and double vision (R. 397, 405). Her blood pressure was elevated, and she had leg swelling and pain (R. 398, 406). She was admitted for hypertension, bilateral DVTs, and history of intracranial hemorrhage (R. 398, 670). Ms. McGuire was discharged home on March 22, 2005 (R. 670). Upon release, Ms. McGuire was referred to Loyola's Anticoagulation Clinic to monitor her warfarin (an anticoagulant) levels, and she made approximately thirty regular visits there between April 2005 and January 2006 (R. 540-47, 671).

On July 29, 2005, Ms. McGuire began care with Dr. Janice Gupta at Loyola's Primary Care Clinic ("PCC") (R. 558). Dr. Gupta noted that Ms. McGuire complained of "dizziness occasionally and a slight headache . . . Ran out of meds this Wednesday and thinks this is why she is having symptoms" (*Id.*). Dr. Gupta observed that Ms. McGuire had "trace" [leg] edema (R. 559). She referred Ms. McGuire to a hematologist and ordered new hypertension medications, as well as an echocardiogram (R. 559-60). When Ms. McGuire returned to the PCC on August 12, 2005, Dr. Gupta was concerned that she could have internal bleeding (R. 556-58). That day, Ms. McGuire was re-admitted to Loyola for blood transfusions, iron studies,

---

[4]IVC filters are used to prevent DVTs from traveling within the body and damaging the lungs. STEDMAN'S MEDICAL DICTIONARY 730 (28th ed. 2006).

and potassium infusions (R. 558). She complained of feeling dizzy, weak, and lightheaded, but after receiving a blood transfusion, "she felt much better" (R. 569). Her doctors "believed her symptoms were secondary to [abnormal menstrual bleeding]," although they did not reach a definitive conclusion (R. 569-70). She was discharged on August 18, 2005 and instructed to follow up with a gynecologist (*Id.*).

On August 29, 2005, Ms. McGuire saw Dr. Scott Graziano at Loyola's Obstetrics and Gynecology ("OB") clinic, complaining of malaise, fatigue, poor and double vision, and abdominal cramps (R. 554-56). Dr. Graziano started Ms. McGuire on Depo-Provera[5] for her bleeding (R. 555-56). On September 6, 2005, Ms. McGuire went to Loyola's Hematology Clinic for her anemia (R. 552). Dr. Cheryl Czerlanis noted that Ms. McGuire complained of fatigue and had mild leg edema but no leg pain (R. 553). Dr. Czerlanis's notes did not mention directives for Ms. McGuire to elevate her legs (R. 552–54).

On September 27, 2005, Ms. McGuire returned to Loyola's PCC, complaining of decreasing visual acuity but otherwise "feeling well" (R. 548). Ms. McGuire had no lower extremity edema or complaints of urinary issues (R. 548-50). She reported one episode of dizziness, but Dr. Jobby Mampilly noted that it occurred on "a hot day [when she] admit[ted] to not keeping up with fluids. She has not felt dizzy since" (R. 548). Dr. Mampilly continued her on warfarin and referred her to Loyola's Ophthalmology clinic (R. 550). At her October 6, 2005 eye examination, her vision was normal (R. 515). She was told to use over-the-counter reading glasses to mitigate any remaining deficits (R. 517). A few days earlier, on October 3, 2005, Dr. Mahesh Shah, a consultative medical examiner for the Bureau of Disability Determination

---

[5]Depo-Provera is a contraceptive injection. *Depo-Provera (contraceptive injection)*, MAYOCLINIC.COM, http://www.mayoclinic.com/health/depo-provera/MY00995, (last visited Aug. 27, 2013).

Services ("DDS"), had also evaluated Ms. McGuire's eyes as part of an earlier application for disability benefits[6] and found that her vision was normal (R. 458).

From February through August 2006, Ms. McGuire saw Dr. Juan Cobo for lab draws and clinic visits (R. 540, 466-90). During that same time period, Ms. McGuire began going to the John H. Stroger, Jr., Hospital of Cook County ("Stroger") for anticoagulant medication refills and clinic visits, receiving care through September 2008 (R. 493-510, 711-13, 723-38).

In connection with her social security application, several consulting physicians evaluated Ms. McGuire in 2008. On August 22, 2008, a consulting physician, Dr. Reynaldo Gotanco, reviewed Ms. McGuire's medical record, completed a Physical Residual Functional Capacity Assessment, and determined that her medically determinable impairments, though not as disabling as she asserted, did cause some physical limitations (R. 714-21). He found that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday, with no other limitations (R. 714-18).

Subsequently, on October 31, 2008, Dr. Debbie Weiss performed a consultative examination and prepared a report for the DDS (R. 740-44). Dr. Weiss catalogued Ms. McGuire's complaints, writing that Ms. McGuire complained of dizziness after taking her blood pressure medication and pain and throbbing in her legs after walking and standing (R. 740-41). Dr. Weiss noted that Ms. McGuire had "slight" tenderness when her calves were squeezed, but "no evidence of poor circulation . . . [or] edema in [her] lower extremities" (R. 743). Dr. Weiss also wrote that Ms. McGuire had no deficits from her intracranial hemorrhage and instructed her to follow up with her doctor about her blood pressure, which was slightly elevated (*Id.*).

---

[6]Ms. McGuire had an earlier application for disability benefits that was denied on January 24, 2007 (R. 37-38). The current proceedings are specifically related to her second claim for disability benefits filed on May 27, 2008.

Although Ms. McGuire was taking hydrochlorothiazide, she did not complain of any urinary issues and answered affirmatively when asked if all of her medical complaints had been addressed during the consultative exam (R. 740-43).

On November 12, 2008, state agency medical consultant Dr. Virgilio Pilapil reviewed Ms. McGuire's records and completed an Illinois Request for Medical Advice ("IRMA"), in which he affirmed Dr. Gotanco's RFC assessment (R. 745-47). Dr. Pilapil had reviewed both Dr. Gotanco's and Dr. Weiss's findings and determined that Ms. McGuire was "not credible" because she "described daily activities that are not significantly limited in relation to her alleged symptoms," and her "description of the severity of her pain is extreme and unsupported by the medical and other evidence of record" (R. 747). Dr. Pilapil opined that Ms. McGuire's treatment and medication regimen for her conditions had "been relatively effective in controlling her symptoms" (*Id.*).

From August 2009 to May 2010, Ms. McGuire received primary care at Dreyer Medical Clinic (R. 748–96). On August 10, 2009, Ms. McGuire established care with Dr. Kristen Cosgrove Counts ("Dr. Cosgrove Counts") (R. 755). At that appointment, Ms. McGuire did not complain of dizziness or urinary problems, although her medications included nifedipine and hydrochlorothiazide (R. 756-57). Dr. Cosgrove Counts also wrote that Ms. McGuire had "no edema and no tenderness" (R. 757). At a November 9, 2009 follow-up appointment, Ms. McGuire denied "dysuria or [urinary] frequency" and dizziness, and Dr. Cosgrove Counts noted that Ms. McGuire had "no edema" (R. 753-54). On February 27, 2010, Dr. Vivien Ho reported that Ms. McGuire was still taking nifedipine and hydrochlorothiazide, as well as aspirin for DVT prevention (R. 748-49). At that time, Ms. McGuire had no complaints of dizziness, and Dr. Ho

did not note any lower extremity edema on her physical exam or report any complaints of urinary incontinence or leg pain (R. 750).

On July 2, 2010, Ms. McGuire was diagnosed with recurrent DVTs at Rush-Copley Medical Center ("Rush") (R. 790). She was prescribed anticoagulants (R. 791-92), and instructed to follow up with Dr. Cosgrove Counts, which she did on July 26, 2010 (R. 788, 796).

## C.

Ms. McGuire, her adult son Lavar Stanford, medical expert Dr. John Cavanagh, and a vocational expert all testified at the July 29, 2010 administrative hearing (R. 34). Ms. McGuire was represented by counsel (*Id.*).

Ms. McGuire testified that her nifedipine makes her dizzy and lightheaded and that she consequently needs to rest for approximately thirty to sixty minutes after each dose (R. 59-60). Ms. McGuire also said her medicines make her "doped up" and affect her memory (R. 47, 54). Her son, Lavar Stanford, testified that Ms. McGuire has had some difficulty remembering to take her medicines and other "small" things, like telephone numbers (R. 76, 78).

Ms. McGuire said that she tries to avoid prolonged walking and standing and testified that she cannot walk for more than an hour or sit for prolonged periods because of her DVTs (R. 47-48, 57-58). She stated that Dr. Cosgrove Counts instructed her to avoid prolonged standing and elevate her legs if they are swollen or painful (R. 50-51). Ms. McGuire reported that she must elevate her legs to waist height for approximately thirty to sixty minutes for pain relief (R. 50-51, 57).

Ms. McGuire also testified that since 2006, she has suffered from urinary frequency and incontinence related to diuretic treatment for her hypertension (R. 61-62). She reported having to urinate approximately every twenty minutes and testified that she often has to change clothes

as a result of "accidents" (*Id.*). Ms. McGuire stated that this is a problem when she goes out (R. 61). When asked if she had notified her physicians of incontinence or other urinary problems, her response was not clear: "Yes, my – my doctor, but not – but not, you know, like a – yes, I have – when I –" (R. 72). She did state, however, that she had not been treated for this problem (R. 72-73). In addition, her son testified that when he drove his mother from Aurora to Chicago for babysitting – an approximately thirty minute trip – he occasionally needed to stop and urinate because of his own hypertension medication (R. 79-80). When asked if he was "the only one who went to the washroom" on those trips, Ms. McGuire's son answered in the affirmative (R. 80). Ms. McGuire did not excuse herself or request a bathroom break during her 73-minute hearing.

Ms. McGuire testified that her most recent employment – babysitting her grandchildren forty hours a week at home – ended in March of 2010 (R. 41-42). Ms. McGuire testified that she helped her grandchildren fix meals and "monitor[ed]" their activities while her daughter worked during the day (R. 45-46). However, Ms. McGuire also testified that she was often sleeping or "out of it" during this time, and that as a result, her daughter was "constantly" checking in on her (*Id.*). In addition to this paid work, Ms. McGuire reported that when she feels able, she does housework like "sweep[ing] or vacuum[ing]" (R. 60). Ms. McGuire does not drive, and her stamina to conduct personal care, like showering, "varies" due to her dizziness, nausea, and leg pain (R. 47).

Ms. McGuire testified that she was dismissed from her last clerical job at an ambulance company "[b]ecause of my productivity and because I have a [criminal] background" (R. 64). She testified that she failed to meet a production quota because she was only completing six of fifteen monthly "problems" required by her employer at the time of her dismissal, stating that she

"thought I was still like on probation, but they felt that I should have been doing more" (R. 71-72). Ms. McGuire also stated that her dismissal was largely based on the fact that her employer did not "hire people with [criminal] backgrounds," and that she had intentionally not informed the company of her criminal "trouble with some checks" by not responding to that question on the job application (R. 64-65). In addition, when Ms. McGuire was asked earlier in the hearing if she had ever been arrested, she said that she had not been arrested for anything except for traffic violations (R. 49).

Ms. McGuire testified that she was physically capable of working at the ambulance company at the time of her dismissal, but not at the time of her administrative hearing (R. 69). She stated that her absence from the workforce, lack of training and experience, and criminal background would prohibit her from doing her previous clerical work (*Id.*). Ms. McGuire also testified that her frequent urination, her need to rest after taking nifedipine, and her inability to meet a production quota would interfere with her ability to function in her previous job (R. 70-71).

Dr. John Cavanagh, a board-certified internal medicine physician, testified as a medical expert ("ME") (R. 82). He first summarized the medical record, including Ms. McGuire's history of intracranial hemorrhage, anemia, and DVTs (R. 83-84). Dr. Cavanagh then testified that Ms. McGuire did not have lasting neurologic deficits from her 2005 intracranial hemorrhage and that her anemia was well controlled with iron supplements (R. 84). He also explained that the IVC filter "intercepts any little pieces of clot that might break off in the leg and travel up the vena cava, the filter then catches them before they can go to the lung" (R. 87).

Dr. Cavanagh testified that Ms. McGuire's medical impairments would not meet or equal a listing, but opined that they would limit her ability to function in a work setting (R. 84-85). Based on the medical evidence, he recommended that Ms. McGuire be limited to a light level of activity (*Id.*). He stated that Ms. McGuire would be able to lift or carry up to ten pounds frequently and up to twenty pounds occasionally, but found no need for any postural, manipulative, or environmental limitations (R. 85-86). He agreed that Ms. McGuire's subjective complaints were consistent with the known side effects of her medications and conditions and stated that he would recommend leg elevation for a patient with Ms. McGuire's history "if [he] found the leg was swollen" (R. 86-87). Finally, he testified that he did not see any directives in the medical record from Ms. McGuire's treating physicians that she elevate her legs (R. 88).

The vocational expert ("VE") reviewed Ms. McGuire's past relevant work as a bakery laborer, which was unskilled medium work; positions equivalent to a general office clerk, which is semi-skilled, light work (however, Ms. McGuire's specific past work would have been light to medium because the file boxes she lifted exceeded twenty-five pounds); and a data entry clerk, which is semi-skilled and sedentary (R. 91-92). The ALJ's first hypothetical asked the VE to "assume a person of the claimant's age, education work experience, and skill set, [who] was able to lift up to ten pounds frequently, and [limited to] light work" (R. 92). The VE testified that such a person could perform all of Ms. McGuire's past relevant work, apart from her bakery laborer position (*Id.*).

The ALJ next asked the VE to assume the same limitations, but additionally limit the individual to "simple, routine, and repetitive tasks" (with no limit on the number of steps required to complete those tasks) (R. 92). The VE testified that the individual would not be capable of performing any of Ms. McGuire's past work, but opined that other work in the region

or national economy would be available, such as a garment correspondent sorter, housekeeper or cleaner, and cashier (R. 93). The ALJ then asked the VE to consider a person of the "claimant's age, education, work experience, and skill set" who would be limited to sedentary work, but able to occasionally lift up to ten pounds (R. 94). The VE opined that such a person could perform Ms. McGuire's past relevant work as a data entry clerk, but agreed that if the person were limited to simple, routine, and repetitive tasks, no work would be available (R. 94-95).

The VE also testified that if a hypothetical person needed two thirty-to-sixty minute breaks in excess of regularly allotted break time, was consistently failing to meet a production quota, or was off task more than ten minutes every hour in a simple, routine job, there would not be available work for her in the economy (R. 95-96). The VE agreed with Ms. McGuire's attorney that if a person needed to elevate her legs to waist height for one hour of the workday, it would limit her ability to perform sedentary work and eliminate any light work (R. 98). Lastly, the VE opined that employers commonly fire employees for failing to disclose criminal convictions on job applications (R. 97).

**D.**

On August 18, 2010, the ALJ issued a written opinion concluding that Ms. McGuire was not disabled from March 25, 2005 through date of the opinion (R. 22). In evaluating her claim, the ALJ applied the standard five-step inquiry for determining disability, which required him to analyze whether Ms. McGuire (1) had not engaged in substantial gainful activity during the period since the alleged onset date; (2) had a severe impairment or combination of impairments; (3) had an impairment that met or equalled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) could perform her past relevant work; or (5) was capable of performing any other work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Kastner v.*

*Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not meet or equal one of the listed impairments, he must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving forward to Step 4. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. 20 C.F.R. §§ 404.1520(e)-(g), 416.920(e)-(g). The claimant bears the burden of proof from Steps 1-4, but the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

Here, at Step 1, the ALJ determined that Ms. McGuire had not engaged in substantial gainful activity since March 25, 2005, the alleged onset date of her disability (R. 24).[7] At Step 2, the ALJ deemed the following impairments severe: hypertension, history of intracranial hemorrhage, deep vein thrombosis, and anemia (*Id.*). At Step 3, the ALJ ruled that Ms. McGuire's medical conditions did not meet or medically equal a listed impairment, including Listing 7.02 (chronic anemia) and Listing 4.11 (chronic venous insufficiency of a lower extremity) (R. 25).

In assessing Ms. McGuire's RFC, the ALJ found that she could perform "the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)." In support of this conclusion, the ALJ highlighted Ms. McGuire's daily activities; her "longitudinal medical history," including records of her doctors' treatment of her hypertension, DVTs, and anemia; the findings of consulting physicians, and the opinion of the ME (R. 26-27). The ALJ found that Ms. McGuire's claims of functional limitations were contradicted by evidence of a "fairly active

---

[7]As noted during her administrative hearing, Ms. McGuire had amended her alleged onset date of disability in this claim to May 23, 2008 (R. 39, 253). While the ALJ found that Ms. McGuire had not been disabled from March 25, 2005 through his August 18, 2010 decision, this discrepancy does not affect our analysis.

lifestyle," which included household chores, attending church, performing in a choir, caring for her grandchildren, and paying her bills (R. 26). In addition, the ALJ observed that Ms. McGuire participated in the hearing "without any overt pain behavior" (*Id.*). Finally, the ALJ highlighted the fact that Ms. McGuire had not left her last job due to any medical reason, but in fact, had been terminated for failing to disclose her prior criminal conviction, a fact "which further calls into question the claimant's veracity" (*Id.*).

The ALJ then detailed the ways in which the medical record "was not consistent with the claimant's subjective complaints," noting that Ms. McGuire's complaints of "hypertension related symptoms such as blurred vision . . . appear to be exaggerated" (R. 26). To support that conclusion, the ALJ relied on the consultative examination in which Dr. Weiss had found Ms. McGuire's vision normal (*Id.*). Moreover, the ALJ found that Ms. McGuire's allegations of limited mobility and need to elevate her legs were similarly "not borne out by the medical evidence of record" (*Id.*). The ALJ emphasized that since Ms. McGuire's hospitalization in March 2005, her hypertension had been well-controlled with medication and that treatment notes since the placement of the IVC filter had "consistently show[n] that the claimant ha[d] normal vascular status of the extremities, no significant calf tenderness, no edema and no acute distress with ambulation" (R. 27). The ALJ also found that Ms. McGuire's anemia had been effectively managed with iron supplements (*Id.*).

The ALJ afforded "great weight" to the ME's testimony, finding that the prescribed treatments kept Ms. McGuire's symptoms "within good control and that she should be able to perform the full range of light work" (R. 27). The ALJ also afforded "great weight" to the opinion of Dr. Gotanco, the state agency medical consultant who shared the opinion that Ms. McGuire's symptoms were well-controlled (*Id.*).

14

At Step 4, the ALJ concluded that Ms. McGuire's RFC allowed her to perform her past relevant work as a general office clerk and data entry clerk (R. 27-28). Consequently, the ALJ found that Ms. McGuire was not disabled (R. 28).

## III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper*, 712 F.3d at 361. The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Id.* at 362. In asking whether the ALJ's decision has adequate support, a court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Id.*

Ms. McGuire raises two challenges to the ALJ's decision. She argues that the ALJ erred in assessing her credibility and in failing to discuss the medical expert's testimony regarding her medication side effects and the necessity of elevating her legs (Pl.'s Mem. at 7-15). For the following reasons, we reject these challenges and find that substantial evidence supports the ALJ's decision.

## A.

Ms. McGuire asserts that the ALJ did not properly evaluate her credibility (Pl.'s Mem. at 10-15). We disagree. The ALJ engaged in a thorough and well-supported credibility analysis, finding Ms. McGuire's claims exaggerated based on his observations of her at the hearing, her dismissal from her last job for failing to reveal her criminal conviction on her job application, and because her claimed limitations exceeded those supported by the medical record or suggested by her daily activities.

Because the ALJ has the best opportunity to observe the claimant's testimony and evaluate her veracity and integrity, we will not overturn his credibility determination unless it is "patently wrong." *E.g., Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)). An ALJ's credibility decision is "patently wrong" only if it lacks any reasonable explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (citing *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). "[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *see Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000).

Ms. McGuire first contends that the ALJ's credibility analysis is flawed because it employed oft-criticized boilerplate language stating that Ms. McGuire's alleged functional limitations were "not credible to the extent they are inconsistent with [her RFC]" (Pl.'s Mem. at 10-11; R. 26). When the ALJ proceeds to articulate the reasoning underlying the credibility determination, however, the use of the boilerplate alone does not require reversal. *Pepper*, 712 F.3d at 367-68; *Carter v. Astrue*, 413 F. App'x 899, 905-06 (7th Cir. 2011) (3-page credibility analysis sufficient despite use of boilerplate language). This Court will defer to the ALJ's credibility finding "as long as the record contains some support for it." *E.g., Hill v. Astrue*, 295 F. App'x 77, 81 (7th Cir. 2008); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Here, the ALJ provided detailed reasons for disbelieving the extent of Ms. McGuire's claimed limitations (R. 26-27). The ALJ discussed Ms. McGuire's activities of daily living, his observation of Ms. McGuire's demeanor during her hearing, and Ms. McGuire's criminal history

(*Id.*). The ALJ also described in detail why he found her claims inconsistent with the medical record (R. 26–27).

Significantly, the ALJ found that Ms. McGuire's credibility was diminished because she did not leave her most recent employment for a medical reason; rather, she was dismissed "for failing to disclose her prior criminal conviction" (R. 26). Ms. McGuire asserts that the ALJ was incorrect: that she was fired for both not disclosing her criminal conviction, *and* failing to meet her employer's required production quota (Pl.'s Mem. at 15) (emphasis added). We find that the ALJ was entitled to discount her veracity based upon her denial and subsequent admission of a past criminal conviction, as well as her statement that she intentionally did not inform her employer of that conviction (R. 49, 64-65). *See Hill*, 295 F. App'x at 81 ("[a]n ALJ is entitled to view with skepticism the testimony of an applicant who has been deceptive"); *see also Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).

In addition, the ALJ assessed Ms. McGuire's credibility based on her demeanor during the hearing, as well as on the disparities between the severity of her subjective claims and the lack of objective medical evidence supporting them. Regarding Ms. McGuire's demeanor during the hearing, the ALJ observed that her ability "to participate in [her] hearing without any overt pain behavior" detracted from her credibility (R. 26). While we acknowledge that the "sit and squirm" test is not dispositive as an indicator of Ms. McGuire's subjective pain level, *see Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000), an ALJ's observations of a claimant during her hearing are nevertheless a proper factor in analyzing credibility. *Id.* The ALJ's ability to observe Ms. McGuire during her hearing meant that he had time to "gauge whether her demeanor, behavior, attitude and other characteristics suggested frankness and honesty and were consistent with the general bearing of someone who is experiencing severe pain." *Id.* The ALJ's

17

observations of Ms. McGuire during her testimony are entitled to special deference because they necessarily contain "intangible and unarticulable elements which impress the ALJ, that, unfortunately leave no trace that can be discerned in this or any other transcript." *See, e.g., Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (quoting *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993)) (internal quotations omitted). The ALJ was entitled to consider Ms. McGuire's ability to appear and participate during her hearing without outward expressions of pain. *See Powers*, 207 F.3d at 436.

The ALJ also highlighted inconsistencies between Ms. McGuire's subjective complaints and the objective medical record which suggested that she had exaggerated her claims (R. 26-27). The ALJ first noted how Ms. McGuire's medication regimen kept her blood pressure stable following her intracranial hemorrhage in 2005 (R. 26). The ALJ acknowledged that Ms. McGuire's anemia had required a blood transfusion in the past, but had otherwise been effectively controlled with iron supplements (R. 27). The ALJ noted Ms. McGuire's 2005 episode of pain and swelling in her calves, but discussed in detail the reasons why he found her treatment was effective and her complaints were inconsistent with her objective medical record (R. 26-27). The Seventh Circuit has stated that "applicants for disability benefits have an incentive to exaggerate their symptoms," and therefore, "an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006); *see West v. Colvin*, No. 12–cv–272, 2013 WL 4478780, at *10 (N.D. Ill. Aug. 19, 2013); *see also Powers*, 207 F.3d at 435-36 (disparity between medical record and subjective claims probative of exaggeration).

The ALJ found further support for disbelieving Ms. McGuire because her subjective complaints, such as "the inability to stand/walk or sit for any protracted period, climb stairs,

[and] remember things and concentrate" were inconsistent with her self-reported activities of daily living (R. 26). Ms. McGuire contends, however, that the ALJ did not sufficiently address her alleged restrictions on those activities, such as the longer than normal time it took her to complete household chores and only shopping with her daughter or a friend due to dizziness (Pl's. Mem. at 13-14). Ms. McGuire also argues that the ALJ impermissibly equated her ability to engage in daily home activities with the ability to engage in full-time work outside her home.

An ALJ's credibility analysis need not be perfect; nor must the ALJ discuss every statement made by a claimant in evaluating her credibility, which is permissible. *See, e.g., McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) ("an ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence'")(citation omitted). Here, the ALJ considered Ms. McGuire's activities simply as one component of the credibility analysis, which is permissible. *E.g., Mobley v. Colvin*, No. 4:12–CV–105–SEB– WGH, 2013 WL 4479073, at *5 (S.D. Ind. Aug. 19, 2013); *Archer v. Astrue*, 09 C 4705, 2011 WL 720193, at *11 (N.D. Ill. Feb. 22, 2011).

The ALJ considered Ms. McGuire's activities in contrast to her claims of severe limitation and found that they undermined her subjective complaints. The ALJ wrote that Ms. McGuire "appears to maintain a fairly active lifestyle," specifically noting activities such as household chores, personal care, social activities, and babysitting (R. 26). And although Ms. McGuire reported having difficulty babysitting her daughter's school-age grandchildren due to being "out of it," both she and her son testified that she also babysat his newborn infant during the same time period (R. 45-46, 78-79, 81-82). When faced with evidence both supporting and detracting from claimant's allegations, the Seventh Circuit has recognized that "'the resolution of competing arguments based on the record is for the ALJ, not the court.'" *Woytsek v. Colvin*, No.

1:12–cv–01816–JMS–MJD, 2013 WL 4479034, at *7 (S.D. Ind. Aug. 19, 2013) (quoting

*Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002)). Based on his observations of the

witnesses and review of the evidence, the ALJ was entitled to conclude that Ms. McGuire had

overstated her symptoms.

Demonstrating that a credibility determination is patently wrong is a "high burden."

*Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010). And Ms. McGuire has not carried that

burden. Here, the ALJ properly analyzed and explained his assessment of Ms. McGuire's

credibility. The ALJ's decision to discount Ms. McGuire's credibility was reasonable and well-

supported – far from patently wrong.[8]

## B.

Ms. McGuire also contends that the ALJ erred by not discussing ME testimony favorable

to her when determining her RFC. Ms. McGuire asserts that she had testified to significant side

effects from her medications, including dizziness, lightheadedness, and nausea from her

hypertension medications, as well as frequent urination caused by her water pills (Pl.'s Mem. at

7; Pl.'s Reply at 2). She also testified that she needed to elevate her legs on a regular basis (Pl.'s

Mem. at 9-10; R. 50-51, 56-57). She argues that the medical expert's testimony corroborated her

claims about these symptoms and limitations and the ALJ was consequently required to

explicitly address these issues. This argument fails.

---

[8]Because we uphold the ALJ's credibility finding, we find that, contrary to Ms. McGuire's assertion, the
ALJ did not err in failing to make a specific credibility finding about her ability to work a job with a production
quota. In posing hypotheticals to the VE, the ALJ must include "all limitations supported by the medical evidence
of record" to prevent the VE from misunderstanding the true extent of the claimant's disability and incorrectly
deeming her capable of work that she cannot actually perform. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir.
2004) (citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). However, the ALJ need not accept a claimant's
allegations of limiting symptoms that he finds – with substantial support in the evidence – are inconsistent with
objective medical evidence or otherwise undermined by concerns about her credibility. *Schmidt v. Astrue*, 496 F.3d
833, 846 (7th Cir. 2007) (only credible impairments and limitations required in hypotheticals); *Potts v. Astrue*, No.
08 C 3297, 2012 WL 850738, at *3 (N.D. Ill. Mar. 13, 2012) (not required to incorporate unsubstantiated complaints
into hypothetical).

Beyond Ms. McGuire's own statements, nothing in the medical record supports her claim that her medications caused any sort of significant impairment that would warrant specific discussion in the decision. Consequently, in an attempt to bolster her subjective complaints, Ms. McGuire contends that the ME's response to a question from her attorney constitutes evidence that supports her claims:

> Q  Are claimant's reports of the side effects of her medications inconsistent with the known side effects of those medications?
>
> A  They are consistent with the side effects known.

(R. 86). Ms. McGuire contends that the ALJ should have explicitly addressed this "favorable" evidence. We find no error on this point. Although the ME stated that Ms. McGuire's reported symptoms were consistent with known side effects, he did not testify that he saw evidence in the record that she actually experienced those effects or if so, to what degree they limited her ability to work. Moreover, the ME reviewed her medical record, and heard all of her testimony, and he opined that even with her impairments, she was capable of light work (R. 85).

We also note that Ms. McGuire's medical record does not reflect that she complained about medication side effects to her doctors or sought changes in her medications due to these alleged problems. *See Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010) (no indication in the record that claimant complained of side effects to his doctors or inquired into changing medication). Indeed, when the ALJ asked her whether she had ever received treatment for her alleged frequent urination problem, she said, "No" (R. 73). Consequently, we find no reason to remand on this ground. An ALJ has no duty to make specific findings concerning the side effects of a claimant's medication. *Labonne v. Astrue*, 341 F. App'x 220, 226 (7th Cir. 2009); *Nelson v. Sec'y. of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985); *Misener v. Astrue*, No. 1:12-CV-36 JD, 2013 WL 633287, at *14 (N.D. Ind. Feb. 20, 2013). The ALJ need

not address every piece of evidence, particularly evidence that is unsupported by medical evidence. And because, as discussed above, the ALJ had found Ms. McGuire not credible, he was not required to include these claimed limitations in his questions to the VE. *Schmidt*, 496 F.3d at 846.

Similarly, we find that the ALJ did not err in failing to specifically address Ms. McGuire's claim that she needs to frequently elevate her legs. Again, her credibility on this issue was diminished because the medical record did not support her claim that her doctor had told her that she was required to elevate her legs in order to avoid blood clots.[9] Ms. McGuire's attorney attempted to mitigate this problem by eliciting testimony from the medical expert, who merely stated that he would advise a patient with Ms. McGuire's medical history to elevate her leg "*if* [he] found the leg was swollen" (R. 87) (emphasis added). But the ME did not testify that Ms. McGuire's current medical condition would require her to elevate her legs. Indeed, in reviewing the medical record, the ME reported evidence of "good recovery" and "resolution of the deep vein thrombosis" (R. 84).

Nor did the medical record substantiate Ms. McGuire's claimed need to elevate her legs. No treatment records since 2005 document significant swelling in Ms. McGuire's legs.[10] In addressing Ms. McGuire's medical treatment for DVTs, the ALJ found "her allegations that she cannot stand or walk because of swelling and throbbing pain in her calves and that she must elevate her legs if she does stand/walk for any prolonged period of time are not borne out by the

---

[9]When the ME testified that he did not see any evidence of a physician directive to elevate her legs, Ms. McGuire's attorney quickly searched in the record and said that he would file a memorandum on the issue if he found something about leg elevation (R. 88). The record contains no follow-up memorandum identifying any medical directions to elevate her legs, and we found no such directive in the treatment notes.

[10]Ms. McGuire asserts that the ALJ erred in stating that she had "no edema" (Pl's. Mem. at 11-12; Pl's Reply at 4). Although it is true that Ms. McGuire's medical record documented several episodes of edema (R. 553, 556, 559, 675), those episodes were all in 2005, with no edema reported in treatment notes from September 2005 on (R. 550, 743, 754, 757, 750). We find that the ALJ made no "significant factual error" on this point; indeed, the ALJ's statement accurately reflected that the objective medical record showed no leg swelling in recent years.

medical evidence of record" (R. 26-27). He stated that medical progress notes and physical examination results showed that Ms. McGuire was able to walk without distress or an assistive device (R. 27). In addition, the objective record supports the ALJ's finding that Ms. McGuire "consistently . . . has normal vascular status of the extremities, no significant calf tenderness . . . [and] no edema" (R. 27). Consequently, because substantial evidence in the record supports the ALJ's finding that her DVTs were well-controlled, the ALJ was not required to address her unsupported claim that she needed to elevate her legs regularly.

## CONCLUSION

For the foregoing reasons, this Court denies the plaintiff's motion to reverse and remand (doc. # 25) and grants the Commissioner's motion to affirm (doc. #36).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: September 4, 2013